**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE

ROBIN LEE SNOWDEN and                                         CASE NO. 15-51308
JULIA ANN SNOWDEN                                                CHAPTER 13

DEBTORS

**MEMORANDUM OPINION AND ORDER**

The chapter 13 Debtors, Robin Lee and Julia Ann Snowden, proposed a reorganization plan that bifurcates the claim of Caliber Home Loans, Inc., as mortgage servicing agent and attorney-in-fact for U.S. Bank Trust, N.A., as Trustee for LSF8 Master Participation Trust ("Caliber") [POC 15-1], into a secured claim valued at $40,000 and an unsecured claim for the balance. [ECF No. 2.] Caliber filed its Objection to Confirmation of Debtor's Plan [ECF No. 24] and the Debtors tendered their Response to Objection by Creditor [ECF No. 46]. Caliber argues that the anti-modification provision of 11 U.S.C. § 1322(b)(2) prevents bifurcation of the claim. [*See* ECF No. 24.]

The parties appeared for a hearing on November 5, 2015, after which they jointly agreed to brief and submit the anti-modification dispute for a decision. [ECF Nos. 53 and 55.] If the Debtors are successful, and modification is allowed, then valuation of the collateral and the interest rate are subject to further proof and argument. If Caliber prevails, then additional evidence is not required. The parties complied with the briefing schedule and the matter is now submitted for a decision. [*See* ECF Nos. 56-63.] Based on the evidence in the record and arguments of counsel, § 1322(b)(2) does not protect Caliber's secured claim from modification.

**I.     FACTS.**

The parties have agreed on certain facts for consideration in making this decision. [*See* Joint Stipulation of Facts, ECF No. 56.] In addition, Mr. Snowden submitted an Affidavit [ECF No. 57] and Caliber attached a transcript of the Debtors' testimony at the August 7, 2015 Meeting of Creditors [ECF No. 59-3]. Neither party objected to this evidence, so it is considered part of the record based on their joint agreement to submit this matter for decision. [*See* ECF Nos. 53 and 55; *see also* ECF No. 56 ("The Debtors and Caliber each reserve the right to supplement the record with evidence or information in addition to these stipulations…").]

The Debtors own six contiguous parcels of real property that are consecutively numbered as Lots 15-20 of Mildred Estates, Garrard County, Kentucky (the "Mildred Estates Property"). Mr. Snowden acquired Lots 15-18 and 20 in April 1998 and acquired Lot 19 from a different seller in August 1998. [ECF No. 56.] Mildred Lane runs around the exterior of the lots, essentially encircling the Mildred Estates Property. Robin Snowden described the property at the initial meeting of creditors as follows: "It's just one little circle. It's really just one place, but there are different deeds for every lot." [ECF No. 59-3.]

The boundaries of the lots that comprise the Mildred Estates Property are defined according to "the plat of record in [Plat] Cabinet 1, at Slide 251," in the Garrard County Clerk's Office. [*See* ECF No. 59-1.] A copy of that plat was not made part of this record. The Debtors receive separate tax bills for each lot, with each lot assigned a distinct Map Number. [ECF No. 59-4] The property tax is assessed based on tax values ranging from $4,000.00 (Lots 15 and 17) to $70,000.00 (Lot 18). [ECF Nos. 57 and 59-4.] According to the tax records, the lots are

2

roughly equal in size, measuring from 1.085 acres (Lot 16) to 1.348 acres (Lot 18).[1] [ECF No. 59-4.]

At some point after Snowden purchased the Mildred Estates Property, a relative placed her manufactured (i.e., mobile) home on Lot 16 of the property (referred to by the parties and herein as the "Second Manufactured Home"). [ECF Nos. 56.] The Second Manufactured Home has a "street address and mailing address of 442 Mildred Lane, Lancaster, Kentucky 40444." [*Id.*] Mr. Snowden lived in the Second Manufactured Home until he purchased the mobile home in which he currently resides in January 2003. [*Id.*] The Second Manufactured Home was never moved from the site after Mr. Snowden left, never permanently affixed to the real estate and remained the personal property of Mr. Snowden's relative. [*Id.*]

The Debtors' mobile home is primarily situated on Lot 18 and has a street and mailing address of 615 Mildred Lane, Lancaster, Kentucky 40444 (the "Snowden Manufactured Home"). [ECF Nos. 56 and 57.] The Debtors also contend that a portion of the Snowden Manufactured Home and its septic system is located on Lot 19. [ECF Nos. 57 and 59-3.] This assertion is accepted as true for the purpose of this decision as Caliber only indicated in the Joint Stipulations that it has not verified the placement of the mobile home on Lot 19. Caliber did not object or file any contrary information.

The Snowden Manufactured Home is the subject of an Affidavit of Conversion of Mobile Home to Real Estate dated May 29, 2003. [ECF No. 59-1 (the "Affidavit of Conversion").] The Affidavit of Conversion is of record in Deed Book 222, Page 287, in the Garrard County Clerk's

---

[1] The size of Lot 19 is not reflected on the tax bill for the property [*see* ECF No. 59-4 at 1-2.], but according to the Debtors' Schedule A, it measures 1.268 acres [ECF No. 1 at 10]. This size seems reasonable based on Lot 19's assessed value of $6,000, which is roughly comparable to the values assessed for Lots 15 ($4,000), 17 ($4,000) and 20 ($5,000), the largest of which is 1.263 acres. [ECF No. 59-4.] If this value is accurate, Snowden's 9-acre estimate for all six lots [*see* ECF No. 57] overstates the size of the Mildred Estates Property, which would total just 7.398 acres (1.268 acres + 6.130 acres) based on the size of the other lots [*see* ECF No. 59-4]. Whichever value is accurate, the difference does not affect this decision.

3

Office, and has the effect of converting the Snowden Manufactured Home from personal property to an improvement to the real property. *See* KY. REV. STAT. § 186A.297(2). The Affidavit of Conversion provides that the Snowden Manufactured Home "shall remain permanently affixed to that certain real property described on 'Exhibit A' . . . ." [ECF No. 59-1.] Exhibit A to the Affidavit of Conversion describes all six lots of the Mildred Estates Property. [*Id.*]

On September 26, 2006, Mr. Snowden obtained a loan from Beneficial Kentucky, Inc. in the original principal amount of $116,998.96. [ECF No. 56, POC 15-1 pp. 7-13.] The Mortgage securing repayment of the loan only covers Lots 15-18 and 20 of the Mildred Estates Property (the "Mortgaged Property"). [ECF No. 56, POC 15-1 pp. 15-24.] Therefore, Lot 19 is unencumbered by the Mortgage. The Mortgage was assigned to Caliber pursuant to an April 24, 2014 Assignment of Mortgage/Deed of Trust. [POC 15-1 p. 14.]

The parties agree Mr. Snowden has resided in the Snowden Manufactured Home from the inception of the loan. [ECF Nos. 56 and 57.] They also agree Mr. Snowden's daughter resided in the Second Manufactured Home when the loan was made and "at least one individual" lived in the Second Manufactured Home at times thereafter. [*Id.*] At the creditors' meeting, Mr. Snowden testified that the last time a tenant resided in the Second Manufactured Home was "around 2008 or '09." [ECF No. 59-3.]

Mr. Snowden testified that Beneficial was aware of the existence of the Second Manufactured Home and averred that he included rental income from 442 Mildred Lane on his loan application with Beneficial. [ECF No. 57.] But at the creditors' meeting, Mr. Snowden testified that he never executed a written lease agreement with any tenant and that only family

4

and friends ever resided at the mobile home. [ECF No. 59-3.] The Debtors did not receive monetary rent payments, but Mr. Snowden said residents would babysit from time to time. [*Id.*]

The parties stipulated: "The Second Manufactured Home was destroyed by fire in approximately 2010, and very little remains of that structure other than the foundation. Today what remains of the Second Manufactured Home is irreparable." [ECF No. 56.] Insurance proceeds from the fire were recovered by the owner of the Second Manufactured Home, and were paid in turn to a third-party lender that held a security interest in the structure. [*Id.*] Neither the Debtors nor Caliber (or its predecessor in interest) received any insurance payment related to the destruction of the Second Manufactured Home. [*Id.*]

The record contains no information regarding the physical characteristics of the six lots that make up the Mildred Estates Property; there are no photographs, plat maps, topographical information or similar proof. The record is also missing information regarding the Debtors' use of the property, except for general testimony regarding the mobile homes. Nothing in the record suggests that any portion of the Mildred Estates Property has ever produced income, except possibly the in-kind babysitting services. The Debtors' schedules indicate they are unemployed and monthly workers' compensation payments are their sole source of income. [ECF No. 1 pp. 6-9, 26-27.]

II.     **ANALYSIS.**

Caliber objects to confirmation of the Debtor's plan, arguing that bifurcation of its claim is prohibited by § 1322(b)(2)'s anti-modification provision. Section 1322(b)(2) gives a debtor broad authority to modify a contract with a creditor under most circumstances. Debtors often use § 1322(b)(2) with § 506(a) to bifurcate an undersecured claim into secured and unsecured components based on the value of the collateral securing the claim. Section 1322(b)(2),

however, prohibits modification of "a claim secured only by a security interest in real property that is the debtor's principal residence."  11 U.S.C. § 1322(b)(2).

The anti-modification exception to a debtor's right to modify a creditor's secured claim in chapter 13 is "intended to encourage the flow of capital into the home lending market." *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 332, 113 S. Ct. 2106, 2112, 124 L. Ed. 2d 228 (1993) (J. Stevens, concurring).  Accordingly, as one commentator has observed:  "Courts have strictly construed this exception to limit its protection to purely consensual home mortgages when the creditor has taken no other security and the real estate has no use other than the debtor's principal residence."  Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 119.1 at ¶ 1, Sec. Rev. May 9, 2011, www.Ch13online.com.

### A.   CALIBER HAS THE BURDEN OF PROOF TO SHOW ITS CLAIM IS NOT SUBJECT TO MODIFICATION.

The Debtors bear "the ultimate burden of persuasion" that modification is permitted, but Caliber "bears the initial burden of proof to show by a preponderance of the evidence that its claim falls within the anti-modification exception of § 1322(b)(2)."  *In re Moore*, 441 B.R. 732, 736 (Bankr. N.D.N.Y. 2010); *see also In re Petrella*, 230 B.R. 829, 832 (Bankr. N.D. Ohio 1999).  The anti-modification exception of § 1322(b)(2) requires three elements of proof:  "(1) the security interest must be in real property; (2) the real property must be the only security for the debt; and (3) the real property must be the debtor's principal residence."  *In re Colcord*, Case No. 15-46941, 2015 WL 5461543, *1 (Bankr. E.D. Mich. Sept. 16, 2015) (citing *Wages v. J.P. Morgan Chase Bank, N.A. (In re Wages)*, 508 B.R. 161, 165 (B.A.P. 9th Cir. 2014) (interpreting identical language in 11 U.S.C. § 1123(b)(5))); *Davis v. Green Tree Servicing, LLC (In re Davis)*, 386 B.R. 182, 186 (B.A.P. 6th Cir. 2008).

The first requirement is satisfied because Caliber's claim is secured by a mortgage on real property, i.e., the Mortgaged Property. The second and third requirements are in dispute. Five lots make up the Mortgaged Property, one of which contained a second mobile home, suggesting there is other security for the debt. Further, the multiple lots and location of the Snowden Manufactured Home might suggest the Mortgaged Property does not qualify as the Debtor's principal residence.

Based on the record, including the information presented by the parties, Caliber has failed to satisfy its burden to prove its claim is entitled to protection from modification.

> B.  THE ANTI-MODIFICATION PROVISION OF § 1322(B)(2) DOES NOT PROTECT CALIBER'S CLAIM BECAUSE IT IS SECURED BY SEPARATE PARCELS OF REAL PROPERTY THAT ARE NOT THE DEBTORS' PRINCIPAL RESIDENCE.

"The fact patterns that test the limits of the protection from modification in § 1322(b)(2) are as diverse as the real and personal property that lenders take as collateral for loans." *See* Lundin & Brown, § 127.1 at ¶ 1, Sec. Rev. Apr. 11, 2011. The fact that a debtor's home sits on a large tract or multiple lots does not automatically lead to a conclusion that the claim is secured by more than just the personal residence. *See, e.g., Fed. Land Bank of Louisville v. Glenn (In re Glenn)*, 760 F.2d 1428, 1441 (6th Cir. 1985) (a claim secured by a single 50-acre tract that contained the debtors' home and was used solely as the debtors' residence was protected by § 1322(b)(2)).

But this is a fact-intensive analysis and the existence of five lots making up the Mortgaged Property demands additional review. *Compare In re Morphis*, 30 B.R. 589, 594 (Bankr. N.D. Ala. 1983) (finding that the anti-modification provision did not protect a lender that was secured by both a lot containing the debtor's residence and an adjoining vacant lot), *with In re Frank*, Case No. 12-06722-8-SWH, 2014 WL 5395857, *5 (Bankr. E.D.N.C. Oct. 23, 2014)

7

(modification was not allowed where an "adjacent lot is seamlessly integrated into the debtor's use of his residence and acts as an expanded back yard and recreation area in connection with the residence."), *and In re Beckford*, 247 B.R. 27 (Bankr. D. Conn. 2000) (barring modification where two lots were used together as a single-family residence and unimproved lot was not saleable as a building lot due to zoning regulations).

The only significant factor in the record that favors a conclusion that the Mortgaged Property is best viewed as a single parcel that is used as the Debtor's principal residence is the Affidavit of Conversion. The Affidavit of Conversion referenced the entire Mildred Estates Property and indicated that the Snowden Manufactured Home became an improvement to that property. But any negative inference from that instrument is tempered significantly by the fact that Caliber's predecessor in interest did not take a lien on Lot 19. The Mortgaged Property is only five lots, but the uncontradicted testimony indicates all six lots make up land inside Mildred Lane. It is hard to accept an argument that Lots 15-18 and Lot 20 comprise a single parcel without the contiguous Lot 19.

This omission is exacerbated by the placement of a portion of the Snowden Manufactured Home, including the septic system that is essential to use of the home, on Lot 19. Mr. Snowden testified: "The only suitable location for the mobile home at 615 Mildred Lane, because of the geography is on both lots 18 and 19. The entire septic system is on lot 19 because that is the only direction the septic system could possibly drain." [ECF No. 57.] These facts indicate a significant portion of the Snowden Manufactured Home is on an unencumbered lot. Further, these facts would substantially affect not only the value of Caliber's collateral, but also the value of Lot 18 to the Debtors. It is clear, therefore, that Lot 19 is an integral part of the entire Mildred

8

Estates Property and its omission prevents a conclusion that the Mortgaged Property is one parcel for purposes of the anti-modification provision of § 1322(b)(2).

The fact that Lot 19 could have been omitted from the Mortgaged Property at all highlights other obvious problems with Caliber's position. The lots making up the Mildred Estates Property were subdivided, which indicates an intention to create separate saleable lots, not a unique parcel made up of the six lots. *See* KY. REV. STAT. § 100.111(22) (the definition of "subdivision" includes property divided "for the purpose, whether immediate or future, of sale, lease or building or development . . . ."). Subdivision of the larger parcel demonstrates an intent to separately convey the smaller individual lots.

The lots were, in fact, conveyed separately. The Debtors acquired the lots four months apart in two separate transactions from different sellers. Further, legal descriptions that reference a subdivision plat show an owner can easily convey any of the lots without any other action. There is no need to obtain a survey, create a metes and bounds description or comply with any zoning or other regulations that might limit creation of separate lots.

The division of the Mildred Estates Property into unique lots is also evidenced by the placement of the Second Manufactured Home on Lot 16. This leads to a conclusion the larger parcel was and is subject to multiple uses. It also suggests that the adjacent Lots 15, 17 and 20 could also have separate uses. These differences are further emphasized by the existence of two separate mailing addresses for the residences.

As indicated previously, the mere subdividing of lots, by itself, might not mean modification is allowed. *See In re Frank*, 2014 WL 5395857; *In re Beckford*, 247 B.R. 27; *see also GMAC Mortg. Corp. v. Marenaro (In re Marenaro)*, 217 B.R. 358 (B.A.P. 1st Cir. 1998) (other lots subject to mortgage could have, but were not, used for other purposes, so modification

was not allowed). But the evidence in the record that favors treatment of the Mortgaged Property as separate lots is more convincing because of the lack of any contrary information in the record. Caliber offered no evidence regarding the Debtors' current use of the adjoining lots or the extent to which they are integrated with the Debtors' use of their residence. There is also no information on topography or other geographic factors that might suggest the lots only have use as one contiguous parcel. Caliber cannot carry its burden of proof without evidence to contradict the facts that suggest the separate lots indicate more than one parcel of real estate secures the underlying loan.

### III.    CONCLUSION.

Caliber did not satisfy its burden to prove it is entitled to the protection of the anti-modification clause in § 1322(b)(2) by a preponderance of the evidence. The division of the property into separate lots that overlap with the unencumbered Lot 19 indicate Caliber's claim is not "secured only by a security interest in real property that is the debtor's principal residence." There is also no specific evidence that would overcome the inferences leading to this result.

Therefore, it is ORDERED that Caliber's Objection to Confirmation of Debtors' Plan [ECF No. 24] is OVERRULED IN PART and modification is allowed. The question remains whether the Debtors' proposed valuation of the Mortgaged Property and proposed interest rate require adjustment. The Court will enter a separate Order scheduling an evidentiary hearing to address the remaining issues.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Friday, February 12, 2016
(grs)